**Martin T. LACEY, Plaintiff,**

v.

**John J. O'ROURKE and Louis Lufrano, individually and as Secretary-Treasurer of Joint Council #16, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, Dave Beck, individually and as General President and John S. English, as General Secretary-Treasurer of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, and Joseph Parisi, Harry Schopback, Leonard R. Geiger, James R. Hoffa, Robert Graham, Vincent Doyle, Bernard Adelstein, Harold Thirion, Einar O. Mohn and Harry Bessler, Defendants.**

United States District Court
S. D. New York.
May 7, 1956.
Supplemental Opinion July 20, 1956.

PALMIERI, District Judge.

The plaintiff has moved for preliminary injunctive relief to prevent his removal as President of Joint Council 16 (Joint Council), a subordinate body of a labor union called the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO (International Body). Jurisdiction is based upon diversity of citizenship.

The controversy between the parties stems from the disputed results of an election of officers of the Joint Council which took place in New York City on February 14, 1956. At this election the plaintiff was a candidate to succeed himself as president. The defendant O'Rourke (hereinafter referred to as the defendant) was his only opponent. The issues joined upon this proceeding relate to the validity of the election for the position of president.

The election resulted in an initial tally of the votes which is conceded by both sides to be correct: 192 votes for the plaintiff Lacey and 181 votes for the defendant O'Rourke. This tally did not include 16 votes which were challenged by the plaintiff. These votes, however, were later declared to be valid by the International Body and were thereafter counted in favor of the defendant O'Rourke. Forty-nine additional votes cast (but not counted for either side) were cast by the representatives of seven locals which had not qualified as affiliates of the Joint Council in accordance with recognized union practice and procedure. Moreover, the representatives of these locals, 258, 269, 275, 284, 295, 362 and 651 (the disputed locals) were never formally accredited or seated in the Joint Council. Although their votes were not counted, the controversy concerning these locals is inseparable from the issues raised in this proceeding.

The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, a labor union and an unincorporated association, is governed by a written constitution and comprises a number of sub-

Godfrey Schmidt, New York City, for plaintiff.

Brenner, Hannan & Murphy, New York City, for defendants. George A. Brenner and Thomas Sheehan, New York City, of counsel.

ordinate bodies and many local unions in the United States and Canada. The Joint Council here involved is one of its subordinate bodies. It possesses considerable authority over the unions within its jurisdiction, which are generally referred to as affiliated locals. Although it exercises a limited autonomous authority, its functions are substantially those of a coordinating and administrative agency subject to the constitutional powers of the International Body. The Joint Council has no constitution or by-laws of its own. Its officers are elected periodically by its eligible membership. By usage and practice, guided to some extent, by provisions of the constitution of the International Body, the eligible voting membership of the Joint Council has consisted of elected officers of the affiliated unions, formally accredited and seated as members. The accreditation procedures have normally included a favorable recommendation with a view to seating, made by the Executive Board of the Joint Council. The number of valid votes in the Joint Council election necessarily turns, in the first instance, upon the number of affiliated unions; and, secondly, upon the number of their elected officers accredited to the Joint Council and seated by it. Although the practices of the Joint Council have not been marked by consistency or regularity, there can be no doubt from the record before me that both sides to this controversy recognized this voting eligibility requirement and accepted it as a rule of conduct with respect to the election of February 14, 1956. All of the ballots here in question were actually challenged because they contravened, in one way or another, this basic rule for the establishment of voting eligibility.

It may be stated at the outset that all of the 16 challenged votes were questioned for good cause by the plaintiff. It would unduly prolong this opinion if each one were to be examined in detail, and they have therefore been made the subject of specific findings of fact which are filed herewith. However, 7 of these disputed votes, those cast by the purported representatives of Local 445, deserve special mention at this point. They were clearly invalid, and their invalidity is sufficient to establish that the result of the election was favorable to the plaintiff. Prior to the election in question, Local 445 had had a turbulent and dishonorable record. Mr. T. L. Hickey, an officer of the International Body and General Organizer, having jurisdiction over substantially the same area as that covered by the Joint Council, gave significant testimony concerning the history of this union. Mr. Hickey was placed in charge of this local's affairs as trustee, by the International Body, in November 1953 because of extortion practiced by several of its officers. Two of them were recently convicted of conspiracy to commit extortion by this Court and were sentenced to serve substantial terms of imprisonment. Their appeals are now pending. One of them testified upon the hearing and admitted that he had fraudulently certified four persons as officers eligible to vote. This officer also purported to certify himself and two fellow officers despite the repudiation of their local and all its officers by the International Body, despite the revolt of the local membership and despite his own conviction, which constituted a disqualification under the provisions of the constitution of the International Body. The following testimony given by this convicted officer of Local 445 is illustrative:

"Q. Isn't it a fact, Mr. Stickel, that William Doyle never did act as president at any time of Local 445? A. That is right.

"Q. And yet you put his name down here as if he had acted at least pro tem. as president? A. He was pro tem. for that election, that's all, not to act as president, just pro tem. for a vote in that election.

"The Court: On your authority? The Witness: That's right.

"The Court: On your personal authority? The Witness: That's right, to take the seven votes, that's right.

"By Mr. Schmidt:

"Q. And that personal authority is in direct violation of the constitutional provision to which we referred a moment ago; is that correct? A. That's right."[1]

The evidence concerning the chartering of the 7 disputed locals and the attempts to seat their representatives, further substantiates the conclusion that the 16 disputed votes counted for the defendant were the product of concerted action calculated improperly to affect the result of the election. Although many of the practices of Joint Council 16 have had no logical consistency and were more notable for their elasticity than for their adherence to definable custom and usage, the procedures with respect to charter applications were clear. Plaintiff's Exhibit 25 in evidence, a form of application for charter, spells out on its face the immediate responsibility of Joint Council 16 for the maintenance of reasonable lines of jurisdictional demarcation between its affiliated locals, and the adherence by the International Body to the coordinating function of the Joint Council in this respect. Over the printed signature of the General Secretary-Treasurer of the International Body, under the caption "Jurisdiction," there appears the following:

"In cities or towns where there is already established a Joint Council of this International, such Council must be given written notice of this charter application."

In another portion of the application, under the heading "Instructions to Organizers," there appears the following:

"State name and address of Joint Council in area and whether notified of this application:"

The disputed locals were chartered by unilateral action of the International Body shortly before the election. Mr. Hickey, the General Organizer, who was the official most directly concerned with the establishment of these disputed locals, knew nothing about them and played no role in their organization. Nor did the Joint Council or the plaintiff ever see an application for charter submitted to the Council in writing as the procedure required. The International Body was requested, but without avail, to provide the application information to the Joint Council. Moreover, the International Body sought to compel the seating of six of the disputed locals and provide them with voting rights within the Joint Council shortly before the election. No explanation has been offered as to why the same treatment was not sought for the seventh disputed local and I can only assume that it was an oversight. The intrusion of the International Body, despite its own established rules, was, to say the least, unusual. Having been effected on the eve of the election without the knowledge or participation of the officials directly responsible, it could have had no purpose except an unwarranted interference with the election of February 14, 1956.

Almost simultaneously with the above described actions of the International Body, supporters of the defendant made vigorous efforts to seat the representatives of the disputed locals without delay. These efforts persisted, despite the decision of the Joint Council to defer the seating pending the receipt of the information requested from the International Body. The information was never received. Thus, the evidence adduced with respect to the chartering of the disputed locals and the attempted seating of their representatives in the Joint Council provide inescapably a factual basis for the plaintiff's allegation that these actions could have had no purpose

---

1. If further evidence were needed of the crass indifference of this officer to his responsibilities, it can be found in the testimony of Theodore Daly, a member of Local 445. He testified that $25,000 of the union funds were used by this convicted officer as a defense fund in the extortion case and that the balance of the union treasury of $29,000 was sought to be used by him for the same purpose, all without the consent of the membership.

except that of tampering with the Joint Council election here in question.

I turn now to the actual election procedures with respect to the disputed Joint Council election of February 14, 1956. The task of supervising the election was entrusted by agreement of the parties to a balloting committee comprising two representatives of the plaintiff and two representatives of the defendant. This committee did not count the 16 challenged votes. The members of the Committee agreed that they should be submitted to the International Body for adjudication. The votes of the disputed locals were to be kept sealed, as the International Body had already ruled they were to be opened later and only to determine whether these votes could affect the final result.

What occurred thereafter clearly indicates a course of action by the International Body inconsistent with an equitable treatment of the plaintiff's objections. On what was, in effect, only two days' notice,[2] the balloting committee members were requested to appear in Washington. No adequate opportunity was afforded to the plaintiff to call his witnesses or submit his proof with respect to the invalidity of the challenged ballots. Within three days the International Body reached its decision *in camera* without considering the plaintiff's evidence.

The defendant has made much of the agreement of the balloting committee to submit the disputed ballots to the International Body for their adjudication. But this agreement to submission clearly contemplated an adjudication upon evidence fairly presented and fairly heard. It was not a submission to caprice, to arbitrariness, to prejudgment or to unilateral action. The plaintiff was entitled to reasonable notice and to a fair opportunity to submit his proof at an orderly

hearing. He was never afforded such an opportunity. The entire course of events subsequent to the short notice for the appearance of the balloting committee indicates not only that the plaintiff was stripped of his right to redress within the precincts of the union administration, but that any recourse to union procedures would have been futile. The plaintiff's position was one of complete frustration. This is emphasized by the fact that the International Body responsible for this was the very body responsible for the hasty chartering of the disputed locals which were organized, as I have already indicated, for no apparent purpose except to affect the results of this election.

■ The International Body should, under every consideration of propriety, have considered itself disqualified to pass upon the 16 challenged ballots. Far from doing this, however, and as a result of hasty and arbitrary action, it considered all of these challenged votes to be valid and counted them in favor of the defendant O'Rourke. In the light of these facts, the defendant's contention that the plaintiff is here prematurely, and should be relegated to further recourse to administrative remedies, is untenable. The plaintiff has made a sufficient showing that he attempted conscientiously to avail himself of his intra-union remedies and that any further compliance with available administrative procedures would be futile.

The defendant has argued that the plaintiff's damage is not irreparable because his salary consists of money which can be paid upon the conclusion of the trial on the merits. But this factor is not conclusive. The plaintiff's leadership entails considerably more than the $25,-000 salary that goes with the position of president of the Joint Council. The position of leadership entails not only a con-

2. Notice was given by the International Body by telegram on Friday evening, February 17, 1956. One of the plaintiff's two representatives was away on a brief vacation. The other did not see the telegram until Monday, February 20th. De-

spite urgent appeals for postponement, the Washington "hearing" took place the next day, February 21st, without the presence of plaintiff's Balloting Committee representatives.

siderable administrative responsibility but is one involving the proposal and formulation of policy. It involves also a position of considerable influence with the numerous members of the affiliated unions and their policies. That position can be very seriously impaired by the interregnum of a president exercising his powers without valid authority.

The impact of the evidence before me is that the Joint Council election of February 14, 1956 was tainted by illegality. The plaintiff has made a sufficient showing to entitle him to a preliminary injunction.

Findings of fact and conclusions of law are filed herewith. A preliminary injunction will issue upon the filing by the plaintiff of adequate security in compliance with Rule 65, Fed.Rules Civ.Proc., 28 U.S.C.A.

Submit order and undertaking on notice.

### On Motion for New Security

Defendants have moved to compel plaintiff to give new security in addition to that posted pursuant to an order dated May 12, 1956, granting a temporary injunction after extensive hearings. The order, in essence, restrained the seating of defendant O'Rourke as president of Joint Council No. 16 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO, and the payment of salary to him, pending the trial of issues relating to the validity of his election.

Defendants contend that unavoidable delays in bringing their case to trial, in obtaining a hearing of their appeal from the order and in pursuing intra-union remedies pursuant to a stipulation authorized by the Court of Appeals, will prevent any final disposition of the case until some time in October, 1956. They now move to increase the security from the $7,500 posted by the plaintiff pursuant to said order, to $25,000, the approximate amount of salary which will have been paid to the plaintiff and withheld from the defendant O'Rourke by October, 1956.

The circumstances of defendant O'Rourke's election were the subject of voluminous evidence submitted at hearings which lasted for a period of two weeks. The evidence presented upon these hearings left no room for doubt that the proceedings leading up to and surrounding the election of the defendant O'Rourke were tainted by illegality. See Opinion of this Court and Findings of Fact and Conclusions of Law dated May 7, 1956. Thereafter, defendants' counsel asserted before me, on at least two appearances, that he had no further evidence to submit upon any further trial of these issues. Thus, there is no reasonable basis for believing that further hearings on the matter should lead to a different result. I can only assume that in the present posture of the case the same issues will be relitigated on the same proof. A further trial would hardly seem justified on this basis. The affidavit of defendants' counsel upon this motion deviates from this position to the extent of making a vague reference to his expectation of new or additional evidence.[1] Moreover, no showing has been made to substantiate defendants' contention that in the event the matter should come to trial with a different result, any moneys then found to be owing to the defendant O'Rourke would not be repaid. In these circumstances, I do not believe the continuance of the injunction need be conditioned on the posting of additional security.

The defendants' motion to increase the security or, in the alternative, to dissolve the temporary injunction is denied.

---

1. The statements referred to are as follows: "I have only conceded that a trial would be fruitless upon the basis of the evidence *as it then existed.* As a matter of logic, this would not exclude a contrary result upon new or *additional* evidence. As a matter of fact, this is ex-

actly what I do expect, which is the reason for the previous motion before Judge Palmieri to modify the injunction at which time I made exactly the comments I now make here." This motion was denied after argument.